IN RE the COMMITMENT OF George Melvin TAYLOR:

STATE of Wisconsin, Petitioner-Respondent,

v.

George Melvin TAYLOR, Respondent-Appellant.†

Court of Appeals

*No. 03–1509. Submitted on briefs February 4, 2004.—Decided March 30, 2004.*

2004 WI App 81

(Also reported in 679 N.W.2d 893.)

† Petition to review denied 6-8-04.

On behalf of the respondent-appellant, the cause was submitted on the briefs of *Ellen Henak*, assistant state public defender, of Milwaukee.

On behalf of the petitioner-respondent, the cause was submitted on the brief of *Peggy A. Lautenschlager*, attorney general, and *Sarah K. Larson*, assistant attorney general.

Before Wedemeyer, P.J., Schudson and Curley, JJ.

¶ 1. CURLEY, J. George Taylor appeals from a Chapter 980 commitment order entered after a jury found him to be a sexually violent person, and an order denying his postcommitment motion. Taylor contends that his trial counsel's failure to challenge the State's use of peremptory challenges to strike only male jurors deprived him of his constitutional right to the effective assistance of counsel. Because Taylor has failed to establish that the results of the jury selection process would have been different had an objection been made, we affirm.

## I. Background.

¶ 2. In May 1997, the State filed a petition seeking to have Taylor committed as a sexually violent person under Chapter 980. *See* Wis. Stat. ch. 980 (1997–98). Prior to the trial, Taylor filed a motion *in limine* seeking to have the entire trial recorded, includ-

ing *voir dire.* The trial court denied the motion indicating that it was not the court's practice to record *voir dire,* but that if a problem developed, a court reporter would be utilized. The *voir dire* process subsequently occurred off the record. At the conclusion of *voir dire,* the proceedings went back on the record. Several jurors were struck for cause. After both parties made use of their peremptory challenges, with the State striking four men, the selected jury consisted of seven women and six men. No objections were made.

¶ 3. After a four-day trial, the jury found Taylor to be sexually violent. He was subsequently committed to institutional care. Taylor appealed the commitment order, and after several motions were filed and the confusion as to the status of Taylor's representation was resolved, we issued an order remanding the matter to the trial court to allow Taylor to file a postcommitment motion.

¶ 4. In his postcommitment motion, Taylor moved the court to vacate his commitment order because the trial court failed to record the *voir dire* process and because he received ineffective assistance of counsel. The trial court denied the motion in two separate orders. Taylor appealed. This court affirmed in part, but remanded the matter to the trial court to examine the effect of trial counsel's failure to raise a challenge under *Batson v. Kentucky,* 476 U.S. 79 (1986), in light of the State's use of all four of its peremptory challenges on male jurors. *State v. Taylor,* No. 98–1030, unpublished slip op. (WI App Nov. 21, 2000).

¶ 5. Taylor then filed a postcommitment motion requesting a new trial. The basis of his motion was his contention that his trial counsel did not provide him with effective assistance when he failed to raise a *Batson* challenge after the State struck only male

jurors. The court held a *Machner*[2] hearing, at which the *voir dire* process was "reconstructed" from testimony of the assistant district attorney and defense counsel, handwritten notes, and a jury panel roster. Both trial counsel admittedly remembered very little, if anything, about the individual jurors. They did, however, have their respective handwritten notes on which to rely.

¶ 6. The testimony established that the first juror struck by the State had a prior battery conviction, served on a civil jury, and felt that prosecutors were unfair. The second juror struck by the State was married to an attorney and had served as the foreman in a criminal jury trial that went to verdict. The third stricken juror had previously served as a juror in at least one prior criminal trial. Although the exact details of his background were unclear, the fourth juror had been on at least two juries, and served as the foreperson in at least one.

¶ 7. The assistant district attorney testified that she struck the first juror because "he was absolutely hellbent on telling me . . . how unfair this prosecution against him had been, and I figured this is not a good person to keep on a jury." He had also served on a prior jury, and the assistant district attorney testified that she did not like using "repeat jurors." She struck the second juror because his wife was an attorney and because he had been the foreman of a criminal jury that reached a verdict. She testified that she struck the third and fourth jurors because of their previous criminal jury experience. She explained: "These trials are so different from criminal jury trials, that I feel peoples'

---

[2] *State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

expectations would be to see a criminal jury trial and they are not going to be getting one. I try to avoid that kind of confusion."

¶ 8. On cross-examination, the assistant district attorney testified that she had not considered whether the individual jurors were male or female when she struck them. In response to the question as to whether, in general, she had a preference as to male or female jurors in Chapter 980 cases, she replied: "All things being equal, I like men because they tend to be more critical of predators. These other people I absolutely didn't want on my jury for the reasons I already stated." On re-direct, in response to a question regarding whether there were any other jurors with prior criminal jury experience, she replied that there were two other jurors that had prior civil jury experience, one of whom may have had experience on a criminal jury as well.

¶ 9. Taylor's trial counsel testified that he was aware of *Batson* at the time of Taylor's trial, but that he did not recall why he did not raise a *Batson* challenge. He further testified that he could not recall what his understanding of *Batson* was at the time of Taylor's trial—whether he "contemplated gender as a basis for *Batson* at the time." After being questioned in regard to the 1994 Supreme Court case making gender a viable basis for a *Batson* challenge,[3] he indicated that he could not recall "one way or another" whether he was aware, at the time of Taylor's trial, that gender was a basis for a *Batson* challenge.

¶ 10. Following the testimony, the trial court heard argument from the State and Taylor, and questioned Taylor's postcommitment counsel in regard to the lack of transcripts. It then held:

---

[3] *J.E.B. v. Alabama*, 511 U.S. 127 (1994).

What we have here is a claim that [trial counsel] did not raise *Batson* issues as to the State's striking of all males in the jury selection. Clearly we don't have a transcript of the jury selection voir dire, so it makes this a little bit more difficult, but my concern and my questions that I asked her really helped me come to the conclusion that a transcript would probably not have made much difference.

The bottom line is that we heard from [the assistant district attorney] today, and if a *Batson* challenge were to have been made she would have testified as to the reasons why she struck the four males. And in my mind right now today from what I heard on the stand, they all appear reasonable. And if I were the trial judge at the time, I would have denied the *Batson* challenge at that time.

So under all of the circumstances in determining that the *Batson* challenge would have been without merit at the time that it may have been brought up, it is clear that the trial attorney's performance is clearly not deficient, and, therefore, the motion is denied.

Taylor now appeals.

## II. ANALYSIS.

¶ 11. Taylor contends that his trial counsel's failure to object to the State's use of its peremptory challenges to strike only male jurors deprived him of his constitutional right to the effective assistance of counsel. Taylor insists that the trial court "made no findings of fact with respect to what trial counsel knew or what his reasons for failing to make the objection were," and that the trial court "incorrectly held that counsel was deficient only if counsel's objection would have been successful." Taylor argues that the proper question, when determining whether trial counsel's performance

was deficient, is whether, based upon the information known to counsel at the time of jury selection, there was a *prima facie* case under *Batson*, and if so, whether trial counsel had a strategic reason for foregoing the challenge. Taylor contends that there was a *prima facie* case and that trial counsel had no strategic reason for foregoing the challenge.[4]

---

[4] Taylor also contends that since there is no record of the *voir dire* proceeding, this court should either assume that the record would support Taylor's claim or grant him a new trial on that basis alone. Taylor does not cite any authority in support of his contention that we should assume that the record would support Taylor's claim, and as such, we refuse to even consider it. *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) ("Arguments unsupported by references to legal authority will not be considered.")

Regarding his contention that we should grant him a new trial purely on the basis of the lack of record, we decline to do so. In a footnote, Taylor cites *State v. Perry*, 136 Wis. 2d 92, 401 N.W.2d 784 (1987) in support of his request. However, *Perry* is clearly distinguishable, and Taylor fails to explain why *Perry* should mandate a new trial here. In *Perry*, portions of the transcripts from the defendant's trial were lost in the mail, including the entire testimony of two witnesses and portions of motion arguments, discussions on stipulations, in-chambers conferences, the prosecutor's closing argument, an offer of proof from a defense witness, and the instructions to the jury. *Id.* at 95–96. The supreme court concluded that the deficiencies in the trial transcripts deprived the defendant of his right to a meaningful appeal, especially considering that one of his claims of error included prosecutorial misconduct. *See id.* at 107–09. Here, nothing was "lost." *Voir dire* was not reported, but at the time of the trial, that was not required. *Compare* SCR 71.01(2) (1995–96) *with* SCR 71.01(2) (1997–98) (amended Jan. 1, 1998). Furthermore, the trial court adequately "reconstructed" the record during the *Machner* hearing. Taylor has failed to persuade us that the absence of transcripts from the *voir dire*

¶ 12. Furthermore, Taylor contends that his trial counsel's deficient performance was prejudicial. He asserts that since there is no Wisconsin case that discusses how prejudice should be measured in a situation such as this—when an allegation of ineffectiveness is grounded in the failure to raise a *Batson* challenge—this court should adopt the approach employed by the Alabama Supreme Court in *Ex parte Yelder*, 575 So. 2d 137 (Ala. 1991). In that case, the Alabama court held that "the failure of trial counsel to make a timely *Batson* objection to a prima facie case of purposeful discrimination by the State in the jury selection process through its use of peremptory challenges is presumptively prejudicial to a defendant." *Id.* at 139. Taylor urges this court to presume prejudice and conclude that he was deprived of his constitutional right to the effective assistance of counsel.

¶ 13. Under *Strickland v. Washington*, 466 U.S. 668 (1984), in order to prevail on a claim of ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and that the defendant was prejudiced as a result of this deficient conduct. *See id.* at 687; *see also State v. Pitsch*, 124 Wis. 2d 628, 633, 369 N.W.2d 711 (1985). To prove deficient performance, the defendant must identify specific acts or omissions of counsel that fall "outside the wide range of professionally competent assistance." *See Strickland*,

---

proceedings deprives him of his right to a meaningful appeal, especially considering the nature of a *Batson* claim—the district attorney's mindset while exercising the State's peremptory challenges would not have been recorded in a transcript, except to the extent of the explanations she would have offered. Those explanations, however, were still available at the hearing following remand.

466 U.S. at 690. To show prejudice, the defendant must demonstrate that the errors were so serious that the result of the proceeding was unreliable. *Id.* at 687.

¶ 14. Both prongs of the *Strickland* test involve mixed questions of law and fact. *Pitsch,* 124 Wis. 2d at 633–34. We will not disturb the trial court's findings of fact unless they are clearly erroneous. *Id.* at 634. However, "[t]he questions of whether counsel's behavior was deficient and whether it was prejudicial to the defendant are questions of law, and we do not give deference to the decision of the [trial] court." *Id.* Finally, it is of consequence to note that if the defendant fails to meet either prong—deficient performance or prejudice —the ineffective assistance of counsel claim fails. *Strickland,* 466 U.S. at 697.

¶ 15. This case, as indicated above, involves a complicating factor—the ineffectiveness claim is rooted in trial counsel's failure to raise a *Batson* objection during the jury selection process. In *Batson,* the Supreme Court declared:

> Racial discrimination in selection of jurors harms not only the accused whose life or liberty they are summoned to try. Competence to serve as a juror ultimately depends on an assessment of individual qualifications and ability impartially to consider evidence presented at trial. A person's race simply "is unrelated to his fitness as a juror."

476 U.S. at 87 (citations omitted). The Court accordingly held:

> [T]he State's privilege to strike individual jurors through peremptory challenges . . . is subject to the commands of the Equal Protection Clause. Although a prosecutor ordinarily is entitled to exercise permitted

peremptory challenges "for any reason at all, as long as that reason is related to his view concerning the outcome" of the case to be tried, the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant.

*Id.* at 89 (footnote and citation omitted). This principle was later extended to the peremptory strikes of defense counsel, *see Georgia v. McCollum*, 505 U.S. 42 (1992), and civil litigants, *see Edmonson v. Leesville Concrete Co.*, 500 U.S. 614 (1991). It was also extended to situations in which the peremptory challenge was exercised to strike a juror of a different race than that of the defendant, *see Powers v. Ohio*, 499 U.S. 400 (1991), and as is relevant to this case, to peremptory challenges based upon gender, *see J.E.B. v. Alabama*, 511 U.S. 127 (1994).

¶ 16. As has been noted by several courts when faced with ineffective-assistance-of-counsel claims such as Taylor's, it would fly in the face of the premise of *Batson* to require a defendant to show that the outcome of the trial would have been different if the composition of the jury, in regard to race or gender, had been altered. *See, e.g., Davidson v. Gengler*, 852 F. Supp. 782, 786–87 (W.D. Wis. 1994); *Yelder*, 575 So. 2d at 138–39. Thus, it seems that instead of determining whether the outcome of the trial was unreliable or would have been different, the proper determination should be whether the jury selection would have resulted differently. Facing a somewhat similar situation, the United States District Court for the Western District of Wisconsin determined:

654

> [T]he correct application of the *Strickland* . . . test for determining prejudice on an ineffective assistance claim is not whether the outcome of the trial would have been different, but . . . whether the results of [the] jury selection process would have been different had a *Batson* objection been made.

*Davidson*, 852 F. Supp. at 783 (citation omitted). The court further observed that should defendants be required to prove that race or gender had an impact on the outcome of the trial, "they would have no realistic way to prove that the outcome of a trial would have been different had a particular juror not been struck[,]" as "[t]hey are prohibited from inquiring into the deliberations process to obtain evidence." *Id.* at 787.

██

¶ 17. Having determined that the proper inquiry is whether the result of the jury selection process would have been different had a *Batson* objection been made, the federal court went on to reject the *Yelder* approach embraced by Taylor. The court reasoned that presuming prejudice in such cases would create the presumption that all *Batson* objections have merit. Instead, it concluded:

> Applying *Strickland* to the jury selection process would require a criminal defendant to prove that if the *Batson* objection has been made there was a "reasonable probability" it would have been sustained and that the trial judge would have taken curative action before the trial began.
>
> Determining prejudice through an evaluation of the result of a hypothetical *Batson* objection protects both *Strickland*'s principle of outcome determinative prejudice and *Batson*'s mandate that the jury selection process not be infected by purposeful discrimination.

*Davidson*, 852 F. Supp. at 787. We agree and adopt this approach. Thus, in order to show prejudice, Taylor must establish that had trial counsel made the *Batson* objection, there is a "reasonable probability" that it would have been sustained and the trial court would have taken the appropriate curative action.

¶ 18. Accordingly, we must now turn to the *Batson* challenge itself. Our supreme court has adopted the *Batson* principles and analysis. *State v. Lamon*, 2003 WI 78, ¶ 22, 262 Wis. 2d 747, 664 N.W.2d 607 (citing *State v. Davidson*, 166 Wis. 2d 35, 39–40, 479 N.W.2d 181 (Ct. App. 1991)). *Lamon* reiterates the three-part, burden shifting analysis set forth in *Batson* for the evaluation of such a challenge:

> [I]n order to establish a prima facie case of discriminatory intent, a defendant must show that: (1) he or she is a member of a cognizable group and that the prosecutor has exercised peremptory strikes to remove members of the defendant's race from the venire, and (2) the facts and relevant circumstances raise an inference that the prosecutor used peremptory strikes to exclude venirepersons on account of their race.

*Lamon*, 262 Wis. 2d 747, ¶ 28 (footnote omitted). Then, if the trial court finds that the defendant has indeed established a *prima facie* case, "the burden shifts to the State to come forward with a neutral explanation for challenging [the dismissed venireperson]" and "[t]he prosecutor's explanation must be clear, reasonably specific, and related to the case at hand." *Id.*, ¶ 29 (citation omitted). This step concerns the facial validity of the prosecutor's explanation. That is, unless the prosecutor intended to cause a disparate impact with his or her peremptory strike, the impact itself does not compromise the neutrality of the strike. *Id.*, ¶ 30. Finally, after

the prosecutor offers a neutral explanation for the strike, the trial court "has the duty to weigh the credibility of the testimony and determine whether purposeful discrimination has been established." *Id.*, ¶ 32. The defendant has the "ultimate burden" of persuading the trial court that there was purposeful discrimination. *Id.* Thus, a showing of disparate impact is not enough—proof of discriminatory intent or purpose is essential for a successful *Batson* challenge.

█

¶ 19. Taylor urges us to employ a *de novo* standard of review in assessing the trial court's determination on the *Batson* challenge. He recognizes the general rule that a trial court's finding on the issue of discriminatory intent will not be overturned unless clearly erroneous, but insists that, under the circumstances of this case, *de novo* review would be appropriate. Taylor cites *Holder v. Welborn*, 60 F.3d 383 (7th Cir. 1995), in support of this contention.

¶ 20. In *Holder*, the Seventh Circuit determined that the reasoning utilized by the Supreme Court for applying the clearly erroneous standard—"the trial court generally conducts the *Batson* inquiry contemporaneously with the *voir dire* procedure, and therefore is in the best position to witness the statements of the challenged jurors and to assess the credibility of the prosecutors as they seek to justify the exercise of a peremptory challenge"—was inapplicable to the circumstances of Holder's case. *Id.* at 388. In particular, Holder's *Batson* hearing was held more than eight years after the *voir dire* proceeding; neither the magistrate who presided over the hearing nor the judge who eventually decided the case was present at the original proceeding, and thus neither had the opportunity to observe the demeanor of the venirepersons as they

answered questions posed by counsel; and both defense counsel and the prosecutor had very little, if any, recollection of the actual proceeding, and thus had to rely upon their notes and the transcripts of the *voir dire* for the *Batson* hearing. *Id.* Accordingly, the court concluded: "[S]ince [the magistrate, the judge,] and the members of this panel all have basically been provided with only a cold record from which to determine if a *Batson* violation occurred at Holder's jury trial, we find that no deference is warranted under these circumstances." *Id.*

¶ 21. Taylor relies on the similarities between the circumstances of his case and those in *Holder* to support his contention. There is, however, a critical difference—the *voir dire* proceeding was not reported in this case. While it may initially seem that the lack of transcripts would strengthen Taylor's argument that we should adopt the *Holder* approach, it appears to do quite the opposite. That is, the Seventh Circuit's decision in *Holder* is grounded in part on the existence of the "cold record" that was available to both courts. Here, the only record available for our review is that of the *Batson* hearing, during which the trial court had the opportunity to observe the prosecutor and consider her explanation for her peremptory strikes *first hand.* We do not have that same unique ability to assess the prosecutor's credibility—we were not at the hearing. As such, the fact remains that, regardless of the similarities between the instant case and *Holder*, the trial court's determination on the merits of a *Batson* challenge in this case boiled down to a credibility determination.

¶ 22. In *Hernandez v. New York*, 500 U.S. 352 (1991) (plurality opinion), the Supreme Court rejected

the contention that appellate courts should independently review the trial court's ultimate determination on discriminatory intent:

> Deference to trial court findings on the issue of discriminatory intent makes particular sense in this context because, as we noted in *Batson*, the finding "largely will turn on evaluation of credibility." In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies "peculiarly within a trial judge's province."
>
> . . . .
>
> . . . [I]f an appellate court accepts a trial court's finding that a prosecutor's race-neutral explanation for his peremptory challenges should be believed, we fail to see how the appellate court nevertheless could find discrimination. The credibility of the prosecutor's explanation goes to the heart of the equal protection analysis, and once that has been settled, there seems nothing left to review.

*Id.* at 366–67 (citations omitted). Thus, discriminatory intent is a question of historical fact. *Lamon*, 262 Wis. 2d 747, ¶ 45. Moreover, Wisconsin has adopted the clearly erroneous standard of review for all three steps of the *Batson* inquiry. *See State v. Lopez*, 173 Wis. 2d 724, 729, 496 N.W.2d 617 (Ct. App. 1992). Here, as noted above, the merits of the *Batson* challenge boiled down to a determination of the assistant district attorney's credibility—an issue of fact. As such, we conclude that the appropriate standard of review is

whether the trial court's finding was clearly erroneous. We conclude that it was not.

¶ 23. Assuming *arguendo* that Taylor managed to establish a *prima facie* case of purposeful discrimination,[5] the essential inquiry that remained was whether the prosecutor had viable gender-neutral explanations for her peremptory challenges. The assistant district attorney testified that she struck the first juror because of his statement that he believed that prosecutors were unfair, and because of his prior civil jury experience. She testified that she struck the second juror because his wife was an attorney and because he had been the foreman of a criminal jury that reached a verdict. She testified that she struck the third and fourth jurors because of their previous criminal jury experience, and because of the significant difference between criminal and Chapter 980 trials. These explanations are reasonable. The trial court accepted this testimony as credible, and presumably concluded that Taylor failed to meet

---

[5] Considering the "facts and relevant circumstances" of this case—e.g., the final composition of the jury and the relevant information available concerning the potential jurors—an inference that the prosecutor used peremptory strikes to exclude potential jurors on account of their gender appears tenuous. However, once a neutral explanation has been offered, "and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant has made a prima facie showing becomes moot." *Hernandez v. New York*, 500 U.S. 352, 359 (1991) (plurality opinion); *State v. King*, 215 Wis. 2d 295, 303, 572 N.W.2d 530 (Ct. App. 1997). As such, an explicit trial court finding that a *prima facie* case had been established is not necessary for this court to evaluate the rest of the analysis. *King*, 215 Wis. 2d at 303.

the ultimate burden of establishing discriminatory intent. We see no reason to upset that determination, as it was not clearly erroneous.

¶ 24. Taylor has not persuaded us that had trial counsel raised a *Batson* objection, there is a "reasonable probability" that it would have been sustained. Thus, he has failed to establish that his trial counsel's failure to challenge the State's use of its peremptory challenges to strike only male jurors deprived him of his constitutional right to the effective assistance of counsel. We affirm.

*By the Court.*—Orders affirmed.